**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No.:

ISLAND IP ACQUISITIONS, LLC,

        Plaintiff,

v.

SPENCER ANTLE,
ISLAND COMPANY LLC, and
ISLAND COMPANY RUM, INC.

        Defendants.

_____/

## COMPLAINT

    Plaintiff Island IP Acquisitions, LLC ("Plaintiff" or "IP Acquisitions"), by and through its undersigned counsel, brings this Complaint against Spencer Antle ("Antle"), Island Company LLC ("ICLLC"), and Island Company Rum, Inc. ("ICRUM") (collectively, the "Defendants"), as follows:

## NATURE OF THE ACTION

    1.    This is an action generally for trademark infringement, deceptive and unfair trade practices, cybersquatting, and conversion arising from Defendants' unauthorized infringement, use, and conversion of IP Acquisitions' intellectual property, including trademarks, social media accounts, websites, and web domains (collectively, "IP Acquisitions' Intellectual Property"), as identified in the chart attached hereto as Exhibit 1.

    2.    In February of 2021, IP Acquisitions acquired IP Acquisitions' Intellectual Property from Centennial Bank. A true and correct copy of the Assignment Agreement between IP Acquisitions and Centennial Bank is attached hereto as Exhibit 2 (the "Assignment").

3.      Centennial Bank initially acquired this same intellectual property through a judicial foreclosure sale (the "Judicial Foreclosure Sale") of Defendants' property, including Defendants' intellectual property, conducted by the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in September of 2019.  This Judicial Foreclosure Sale was conducted as a result of Defendant Antle, Defendant ICLLC, and other affiliated, now-defunct entities owned or controlled by Antle, defaulting on a note owned by Centennial Bank.  A true and correct copy of the Final Judgment is attached hereto as Exhibit 3 (the "Final Judgment").

4.      Despite the Judicial Foreclosure Sale and the Assignment, Defendants have (1) used and continue to use IP Acquisitions' Intellectual Property, (2) filed new trademark applications for marks which are identical to or are derivatives of IP Acquisitions' Intellectual Property, (3) purported to transfer ownership or control of IP Acquisitions' Intellectual Property to other entities, and (4) refused to relinquish control of websites, web domains, and social media accounts which were subject to the Judicial Foreclosure Sale.

5.      IP Acquisitions has been damaged and continues to be damaged as a result of Defendants' unauthorized infringement, use, and conversion of IP Acquisitions' Intellectual Property, Defendants' unfair and deceptive business practices, and Defendants' cybersquatting, and IP Acquisitions seeks damages and to enjoin Defendants' unlawful activities.

## PARTIES

6.      Plaintiff IP Acquisitions is a limited liability company duly organized under the laws of the state of Delaware with an address located at 1209 Orange Street Wilmington, DE 19801.

7. Upon information and belief, Defendant Spencer Antle is a natural person domiciled in Palm Beach County, Florida who is promoting infringing goods and doing business throughout the United States including within this District.

8. Upon information and belief, Defendant ICLLC is a limited liability company organized under the laws of the state of Florida, with a principal address of 312 Clematis Street #401, West Palm Beach, FL 33401. *See* Division of corporations Sunbiz Record for ICLLC, a true and correct copy of which is attached hereto as Exhibit 4. Upon information and belief, Mr. Spencer Antle and Ms. Mary Lousie J. Antle are the sole members and managers of ICLLC. *See id*. According to its most recent filings with the Florida Division of Corporations, ICLLC may be served with process by delivering a summons and a true and correct copy of this Complaint to its registered agent for receipt of service of process to Island Company, LLC, 312 Clematis Street, Suite 401, West Palm Beach, FL 33401. *See id*.

9. Defendant ICLLC vacated the 312 Clematis Street address on or about July 31, 2019, as a result of a July 31, 2019 Final Judgment For Possession issued by the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County Florida[1]. ICLLC has since failed to update the address of its registered agent. Pursuant to Fla. Stat. 48.062, Defendant ICLLC may be served with process by delivering a summons and a true and correct copy of this Complaint on either of ICLLC's managers, Mr. Spencer Antle, or Ms. Mary Lousie J. Antle.

10. ICLLC has been listed as "inactive" on Sunbiz.org by Florida's Department of State, Division of Corporations since at least September 27, 2019. *See* Ex. 4. Upon information and belief, despite its "inactive" status, ICLLC continues to operate and hold itself out to the public

[1] Case No. 50-2019-CA-008938-XXXX-MB, Filing #93417351.

3

as a business entity.  *See, e.g.,* State Court[2] Filing # 146419552, Case No. 50-2019-CA-004196-XXXX-MB, filed March 25, 2022 (Response to IP Acquisitions' Motion to Reopen Case and Intervene for the Purpose of Enforcing Summary Final Judgment, in which attorney Traci H. Rollins of the law firm Gunster, Yoakley & Stewart, P.A. purported to be "Attorneys for Defendants Spencer L. Antle and Island Company, LLC"), a true and correct copy of which is attached hereto as Exhibit 5.

11.     Upon information and belief, Defendant ICRUM is a corporation organized under the laws of the state of Delaware, with a principal address of 7750 Okeechobee Blvd #4-213, West Palm Beach, FL 33411.  Upon information and belief, Antle is the chairman and sole director of ICRUM.  ICRUM may be served with process by delivering a summons and a true and correct copy of this Complaint to its registered agent for receipt of service of process, Corporate Creations Network, Inc., 801 US Hwy 1, North Palm Beach, FL 33408.

## JURISDICTION

12.     Pursuant to 15 U.S.C. §§ 1121(a) and 1114 and 28 U.S.C. §§ 1331, and 1338, this Court has original subject matter jurisdiction over IP Acquisitions' claims for unlawful use of IP Acquisitions' Intellectual Property under 15 U.S.C. § 1125.

13.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over IP Acquisitions' state law claims, which arise from a common nucleus of operative facts to the Federal trademark claims under 15 U.S.C. § 1125.

14.     This Court has personal jurisdiction over each Defendant because each has substantial, continuous, and systematic contacts with this State.

---

[2] As used herein, "State Court" refers to the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida.

15.     This Court has personal jurisdiction over Antle because he is a resident of Florida.

16.     This Court has personal jurisdiction over ICLLC because it is a Florida domiciled company with a principal place of business in Florida.

17.     This Court has personal jurisdiction over ICRUM because (1) its principal place of business is in Florida; (2) its sole managing member, Antle, resides in Florida; and (3) it has transacted substantial business in Florida, including (a) conducting an improper transfer of collateral which was subject to a security interest now owned by IP Acquisitions, and (b) committing acts of infringement in Florida, including selling and shipping products in Florida and in this District which infringe IP Acquisitions' Intellectual Property.

18.     Defendants have marketed, sold, and delivered the infringing products in the Southern District of Florida by selling and delivering infringing products to retailers and consumers located within the Southern District of Florida.

## VENUE

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant resides in this District and in Florida, because a substantial portion of the acts or omissions giving rise to IP Acquisitions claims occurred in this District, because Defendants expect or should reasonably expect that their acts and omissions have legal consequences in this District, and because at least one Defendant is subject to this Court's personal jurisdiction for this action.

## BACKGROUND

### *Defendants' Default*

20.     From 2003 to present, Antle has operated his Island Company business through at least a dozen various companies and corporations in the United States and the Caribbean, including

ICLLC; ICRUM; Island Holding Group (Cayman Islands); Rum Company, LLC; Island Expeditionary Group, LLC; Island Company Lifestyle Products, LLC; IC Retail MV, LLC; IC Retail Nantucket, LLC; IC Retail Naples, LLC; IC Retail Worth Avenue, LLC; Exile Entertainment, Inc.; Tannies LLC; Escapist Radio LLC; Escape Travel, LLC; and Island Company Duty Free, LLC. Most of these entities are now inactive, defunct, and/or insolvent.

21.    At least as early as January 2003, Defendant Antle began using various trademarks and service marks with the terms "Island Company," and his various business entities obtained registrations on these marks with the United States Patent and Trademark Office ("USPTO") as well as with government trademark authorities abroad. Most of these trademarks and service marks were registered by and/or initially assigned to ICLLC.

22.    For example, in 2015, ICLLC stated in a complaint, filed in this District Court, that "Island Company [ICLLC] is, in part, engaged in the business of designing, selling and distributing, throughout the world and within this Judicial District, high quality clothing and accessories under federally registered trademarks, including but not limited to the mark: ISLAND COMPANY (Ex. 6 at ¶ 3), and further stated that "Island Company [ICLLC] is the owner of the following valid United States Federal Trademark Registrations for the Mark ISLAND COMPANY: Registration No. 4,663,651 … and Registration No. 4,519,596" (Ex. 6 at ¶ 6). *Island Company LLC v. American Island Co. LLC*, Case No. 9-15-cv-80084, Doc. No. 1 (S.D. Fla. Jan. 23, 2015), a true and correct copy of which is attached hereto as Exhibit 6.

23.    In 2013, ICLLC stated in another complaint filed in this District Court that "Island Company [ICLLC] is the owner of the following valid United States Federal Trademark: QUIT YOUR JOB BUY A TICKET GET A TAN FALL IN LOVE NEVER RETURN Registration No. 3,760,762," and further stated that "the Mark has been used in interstate

commerce to identify and distinguish Island Company's high quality apparel and other goods since April 2005 …."  (Ex. 7 at ¶¶ 7 and 8).  *Island Company LLC v. Abercrombie & Fitch, et al.*, Case No. 9:13-cv-80333, Doc. No. 1 (S.D. Fla. Apr. 5, 2013), a true and correct copy of which is attached hereto as Exhibit 7.

24.    In the 2015 complaint, ICLLC also identified a website as being owned by ICLLC: "The Plaintiff [ICLLC] also owns and operates the website www.islandcompany.com."  Ex. 6 at ¶ 8.  Notably, as of the date of the filing of this Complaint, Antle refuses to relinquish control of www.islandcompany.com to IP Acquisitions, purporting that the website is his personal property, not the (foreclosed) property of ICLLC.

25.    On or about December 5, 2013, lender Broward Bank of Commerce (which subsequently merged with Centennial Bank) entered into a loan agreement with borrower ICLLC (the "Loan Agreement"), whereby Broward Bank of Commerce agreed to loan $1.5 million to ICLLC, and ICLLC executed and delivered a Note to that effect (the "SBA Note").  *See* State Court Filing # 87208549, March 29, 2019 Complaint, Case No.: 50-2019-CA-004196-XXXX-MB, at pages 11-25, a true and correct copy of which is attached hereto as Exhibit 8.  Because the loan was partially guaranteed by the U.S. Small Business Administration (the "SBA"), the SBA Note is in accordance with SBA Form 147.  *See* Ex. 8 at page 25.

26.    The Loan Agreement required that ICLLC "shall not, without the prior written consent of Lender … sell, transfer, mortgage, assign, pledge, lease, grant a security interest, or encumber any of Borrower's assets," and that it would not "sell Collateral …."  Ex. 8 at page 17, "Negative Covenants", "Indebtedness and Liens", and "Continuity of Operations".  Further, the Loan Agreement defined "Borrower" to "include all of Borrower's [ICLLC's] subsidiaries and

affiliates." Ex. 8 at page 21, "Subsidiaries and Affiliates of Borrower". Defendant Antle signed the Loan Agreement in his capacity as manager of ICLLC. Ex. 8 at page 24.

27.     The SBA Note states that "Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns." Ex. 8 at page 28, "Successors and Assigns". The SBA Note was signed by Defendant Antle in his capacity as manager of ICLLC. Ex. 8 at page 30.

28.     On December 5, 2013, ICLLC also executed and delivered to Broward Bank of Commerce a Security Agreement (the "Security Agreement"), wherein ICLLC granted a security interest (the "Security Interest") in certain Collateral (as such term is defined and more specifically described in the Security Agreement) (the "Collateral"). *See* Ex. 8 at pages 31-37. Defendant Antle signed the Security Agreement in his capacity as the manager of ILCC. The Security Agreement defines "Collateral" as including, among other things the following:

> "1.6 Intellectual Property.   Any and all intellectual property including, without limitation, copyrights, trademarks, service marks, and patents whether now owned or hereafter created or acquired. Any and all websites, URL's, email addresses, telephone numbers, and fax numbers whether now owned or hereafter created or acquired."

Ex. 8 at page 32. The Security Agreement further states that:

> "Debtor [ICLCC] is the sole owner of the Collateral, free and clear of any and all liens or encumbrances, and will defend the same against all claims and demands of all persons whomsoever."

Ex. 8 at page 33. The Security Agreement further states that:

"4.2 No Disposition of Collateral.  Except for its inventory, …, the

Debtor [ICLLC] shall not sell, transfer, lease, or otherwise dispose

of the Collateral."

Ex. 8 at page 33.

29.     Also on December 5, 2013, Spencer Antle executed and delivered to Broward Bank
of Commerce an unconditional guarantee (the "Antle Guarantee"), whereby Antle guaranteed the
obligations of ICLLC under the Note.  Ex. 8 at pp. 38-42.  Because the Note was partially
guaranteed by the SBA, the Antle Guarantee is in accordance with SBA Form 148.

30.     The Antle Guarantee defines "Collateral" as "any property taken as security for
payment of the Note or any guarantee of the Note."  *Id*. at page 38, "Definitions".  The Antle
Guarantee stated that "Guarantor [Antle] will preserve the Collateral pledged by Guarantor to
secure this Guarantee."  *Id*. at page 40, "Duties as to Collateral".  As described below, Antle did
not preserve the Collateral, including the intellectual property rights defined as Collateral in the
Security Agreement, but instead purported to transfer many of these assets from ICLLC to himself
and to various other entities in the United States and the Caribbean, in an apparent effort to conceal
and/or shield such assets from the reach of creditors.

31.     On or about October 24, 2014, Broward Bank of Commerce, through a merger,
became the successor institution, Centennial Bank.  *See* Ex. 8 at page 68.

32.     Less than a month before obtaining the $1.5 million loan for ICLLC, Antle formed
another Florida entity, Rum Company, LLC, on November 12, 2013.  *See* Sunbiz.org Records for
"Rum Company, LLC", a true and correct copy of which is attached hereto as Exhibit 9.  On
information and belief, from December 2013 to January 2019, Defendants engaged in the improper
transferring of some of the Collateral which was subject to the Security Agreement to other

affiliated entities, including Rum Company, LLC, and Cayman Islands-based Island Holding Group, without the knowledge or consent of Centennial Bank. For example, on July 21, 2016, ICLLC transferred some of the Collateral to an offshore Cayman Islands-based entity, Island Holding Group. *See* Trademark Assignment, attached hereto as Exhibit 10 (purporting to transfer ownership of trademark ISLAND COMPANY RUM SIMPLY THE SMOOTHEST X from ICLLC to Island Holding Group (Cayman Islands)). On information and belief, ICLLC's transfer and alienation of this Collateral was not disclosed to the holder of the Security Interest in the Collateral, Centennial Bank, nor did Centennial Bank consent to the offshore transfer, in violation of the Loan Agreement, the SBA Note, the Security Agreement, and the Antle Guarantee.

33.     On January 2019, ICLLC breached and defaulted under the Note by failing to make the monthly payment due January 1, 2019, and failed to make all subsequent payments. Ex. 8 at pages 1-10. Further, Antle breached and defaulted under the Guarantee by failing to pay the indebtedness due under the Note. Ex. 8 at pages 5-6.

34.     On March 29, 2019, Centennial Bank, which owned and held the Note and all related loan documents, sued ICLLC, Spencer Antle, Island Company Lifestyle Products, LLC, and several additional related or affiliated entities (the "Defaulting Defendants"), for damages and "to foreclose a security interest in personal property located in Palm Beach County, Florida." *See* Ex. 8 at page 1.

35.     On September 9, 2019, the State Court entered *Summary Final Judgment (Security Interest) as to Island Company, LLC, Spencer Antle and Island Company Lifestyle, LLC* (the "Final Judgment", Ex. 3) in the aggregate amount of $1,082,834.63 bearing interest at the rate of 6.77% per year. The Final Judgment provides, *inter alia*, that "Centennial Bank holds a lien …

superior to any claim of the Defendants and is entitled to possession of the following described personal property: SEE ATTACHED." *Id.* (all caps in original).

36.     The Final Judgment's attachment includes a provision from the Security Agreement identifying Centennial Bank's collateral, including personal property described as, "1.6 Intellectual Property. Any and all intellectual property including, without limitation, copyrights, trademarks, service marks, and patents whether now owned or hereafter created or acquired.  Any and all websites, URL's email addresses, telephone numbers, and fax numbers whether now owned or hereafter created or acquired." *See* Ex. 3 at page 4, "1.6 Intellectual Property".

37.     The Final Judgment further provides, "The aforesaid lien of Centennial Bank is prior, paramount and superior to all rights, claim, liens, encumbrances and equities of the Defendants and all persons, firms or corporations claiming by, through or under any of the Defendants." *Id*. at page 2.

38.      Moreover, the Final Judgment provides, "Defendants shall be foreclosed of all estate or claim in the aforementioned property, and the property will be possessed by and may be sold by Centennial Bank free and clear of all claims of Defendants and all persons, firms or corporations claiming by, through or under any of the Defendants." *Id*.

39.     No party appealed the Final Judgment.

### *IP Acquisitions Acquires the Intellectual Property Collateral*

40.     Subsequently, in February of 2021, IP Acquisitions acquired the foreclosed Collateral from Centennial Bank pursuant to an Intellectual Property Purchase Agreement and Assignment (the "IP Purchase Agreement").  *See* Ex. 2.  The IP Purchase Agreement identified intellectual property, including trademarks, service marks, websites, web domains, and social

media accounts, which Centennial Bank had acquired from the Defaulting Defendants and which were to be transferred to IP Acquisitions. *See* Ex. 2 at pp. 1-3 and 7-23.

41.     Since February of 2021, IP Acquisitions has invested significant time, funds, and resources in commercializing IP Acquisitions' Intellectual Property.

42.     Shortly after acquiring the intellectual property from Centennial Bank, IP Acquisitions became aware that Defendants were continuing to use the trademarks and service marks and were refusing to relinquish control of websites, web domains, and social media accounts which were subject to the Judicial Foreclosure Sale.

43.     On November 22, 2021, IP Acquisitions notified counsel for Antle that Antle was infringing IP Acquisitions' Intellectual Property, and demanded that Antle cease all infringing activities and relinquish control of the subject websites, web domains, and social media accounts.

44.     In reply, on December 22, 2021, Antle's counsel appeared to argue that the subject intellectual property, which Centennial Bank had understood to be ICLLC's Collateral when ICLLC obtained the $1.5 million SBA-backed loan, was instead the property of Antle individually, and therefore beyond the reach of creditors.  A true and correct copy of the December 22, 2021 letter from Antle's counsel is attached hereto as Exhibit 11.

45.     In an effort to obtain clarity as to Defendants' position and to enforce the State Court's Final Judgment, on March 7, 2022, IP Acquisitions moved to intervene in the State Court foreclosure action. *See* State Court Filing # 145217063 in Case No. 50-2019-CA-004196-XXXX-MB, a true and correct copy of which is attached hereto as Exhibit 12.  The State Court denied the motion to intervene on procedural grounds alone, stating that "the [State] Court does not believe that the circumstances of this case fall within the exception where intervention is permitted post-judgment," and that "The denial is without prejudice to the right of Island IP Acquisitions, LLC

[IP Acquisitions] to file a lawsuit seeking a declaratory judgment and/or other relief or redress …
and is not a determination of the underlying merits of the parties' disputes."  A true and correct
copy of the State Court's Order Denying Motion to Reopen Case and Intervene for Purpose of
Enforcing Summary Final Judgment is attached hereto as Exhibit 13.

46.     It is clear that all intellectual property, including but not limited to trademarks,
social media accounts, and web domains, which was Collateral to the Security Agreement, was
foreclosed upon by Centennial Bank in 2019, and subsequently sold to IP Acquisitions in 2021.

47.     At the time of the default and foreclosure, ICLLC, Antle, and/or affiliated entities
were in possession of the intellectual property identified in Exhibit 1.  These assets are now owned
by IP Acquisitions.

### *Defendants' purported transfer of Collateral to affiliated entities in an attempt to escape the reach of creditors*

48.     Defendants have demonstrated a pattern whereby they purport to own certain
intellectual property when they seek to obtain financing or assert rights associated with that
property, and then subsequently disclaim ownership of that property in order to avoid the reach of
creditors.  For example, as noted in Paragraph 26 above, ICLLC stated in a 2015 Complaint filed
in  Federal  Court  in  this  District  that  ICLLC  "owns  and  operates  the  website
www.islandcompany.com".  *See* Ex. 6, paragraph 8.  Yet despite asserting ownership of the
website in a 2015 Federal Court pleading, seven years later, on information and belief, Defendant
Antle now appears to allege that the website (among other intellectual property) was ***not*** an asset
of ICLLC, and was not subject to the Judicial Foreclosure Sale.  *See* Ex. 11.

49.     As another example of this pattern, as noted above, Defendant ICLLC and affiliated
entities pledged their Intellectual Property rights as Collateral to the Security Interest of the Note

in 2013.  Prior to defaulting on the Note in 2019, Defendants transferred (or purported to have transferred) assets which had been pledged as Collateral to other entities.  For example, after pledging all of its trademarks as Collateral, ICLLC transferred (or purported to have transferred) some of these trademarks to Cayman Islands-based Island Holding Group.  Similarly, after pledging all of its websites and social media accounts as Collateral, ICLLC appears to have transferred (or purported to have transferred) these websites and social media accounts to Antle personally and/or to other affiliated entities.  On information and belief, such transfers were made without the knowledge or consent of Centennial Bank.

50.    Subsequent to Defendant ICLLC and affiliated entities providing the subject intellectual property as Collateral for the Security Agreement in 2013, any purported transfer or alienation of intellectual property from ICLLC to Antle personally or to any other entities, including affiliated U.S.-based entities and/or offshore Cayman Islands-based entities, was an improper attempt to transfer assets which were Collateral subject to the Security Agreement, and all such transfers were invalid.  Further, any subsidiaries or affiliated entities of ICLLC are bound by the terms of the Loan Agreement, including with respect to the Collateral now owned by IP Acquisitions.  *See* Ex. 8 at page 21, "Subsidiaries and Affiliates of Borrower" (Loan Agreement defining "Borrower" to "include all of Borrower's [ICLLC's] subsidiaries and affiliates.")

51.    Although the Rum Company, LLC was not a party to the Note or the Security Agreement, because Antle is a member of Rum Company, LLC, during the foreclosure action, the State Court held that it "may order the sale of Spencer Antle's interest in the single-member LLC pursuant to a foreclosure sale."  *See* December 5, 2019 Order Granting Plaintiff's Motion for Entry of Charging Order, State Court Filing # 99879527 in Case No. 50-2019-CA-004196-XXXX-MB, a true and correct copy of which is attached hereto as Exhibit 14.  Rum Company, LLC was deemed

14

"INACTIVE" on September 27, 2019 by the Florida Division of Corporations.  *See* Ex. 9.  Antle then proceeded to form a new Florida entity, ICRUM, on November 12, 2021 (*see* Sunbiz.org records for Island Company Rum, Inc., a true and correct copy of which is attached hereto as Exhibit 15), which imports and sells products that infringe on IP Acquisitions' Intellectual Property, and which, on information and belief, operates websites, web domains, and social media accounts which are all IP Acquisitions' Intellectual Property.

### *Defendants' Infringement of IP Acquisitions' Intellectual Property*

52.     Thus, despite the Judicial Foreclosure Sale, the Defendants have refused to cease infringement of IP Acquisitions' Intellectual Property and have refused to transfer control of the websites, web domains, and social media accounts to IP Acquisitions.  True and correct copies of screenshots taken from Defendants' websites and social media accounts which evidence ongoing infringement of IP Acquisitions Intellectual Property and violations of the Judicial Foreclosure Sale are attached hereto as Composite Exhibit 16.

53.     Defendants continue to violate the provisions which govern the Judicial Foreclosure Sale by using the ISLAND COMPANY trademark to market and promote various products, including rum, clothing, and drinkware.  For example, Defendants operate the Island Company Instagram social media account which actively utilizes the ISLAND COMPANY trademark, as shown below:

15



(Ex. 16 at page 1, from https://www.instagram.com/islandcompany/?hl=en).

54.     A May 30, 2022 post on the Island Company Instagram page confirms that Defendants intend to continue using IP Acquisitions' Intellectual Property to market products, including bottled rum, as shown below:



(Ex. 16 at page 2,

fromhttps://www.instagram.com/reel/CeLVaUFArwI/?utm_source=ig_web_copy_link).

55.    A May 25, 2022 Instagram post on Defendant Antle's personal Instagram account

utilizes the ISLAND COMPANY Mark in multiple instances, including in the labels shown in the

below photograph and the use of "@islandcompany" and "@islandcompanyrum" in the

accompanying text:



(Ex. 16 at  page 3, from https://www.instagram.com/p/Cd-

4rQfraKu/?utm_source=ig_web_copy_link).

56.     Mr. Antle's personal Instagram page identifies himself as "Creative Director of

Island Company":



(Ex. 16 at page 4, from https://www.instagram.com/spencerantle/?hl=en).

57.    As another example of Defendants' infringement, Defendants continue to maintain possession and control of the www.islandcompany.com web domain, which on or about February 7, 2022, began automatically redirecting visitors to www.islandcompanyrum.com. *See* Internet Archive, www.islandcompany.com, a true and correct copy of which is attached hereto as Exhibit 17.

58.    As another example of Defendants' infringement, Defendants continue to maintain possession and control of the www.islandcompanyrum.com website, which name is a derivative of the ISLAND COMPANY Mark owned by IP Acquisitions, and which was acquired by IP Acquisitions via Centennial Bank through the Foreclosure Sale. *See* Ex. 16 at page 5.

59.    As another example of Defendants' infringement, Defendants continue to use the QUIT YOUR JOB BUY A TICKET GET A TAN FALL IN LOVE NEVER RETURN Mark, which is owned by IP Acquisitions.  An April 21, 2022 post on the Island Company Instagram page, which is run by one or more of the Defendants, markets clothing utilizing this mark:



(Ex. 16 at page 6, from

https://www.instagram.com/p/Ccm97xAuUuU/?utm_source=ig_web_copy_link)

60.     As another example of Defendants' infringement, an April 12, 2022 post on Island

Company's Instagram page utilizes IP Acquisitions' Intellectual Property in marketing drinkware:



(Ex. 16 at 7, from

https://www.instagram.com/p/CcPwjQVOews/?utm_source=ig_web_copy_link).

61.     As another example of Defendant's infringement, a June 20, 2022 post on Island

Company Rum's Instagram page utilizes IP Acquisitions' Intellectual Property in marketing

drinkware:



(Ex. 16 at page 23,

https://www.instagram.com/stories/highlights/17910977912252911/?hl=en).

62.     As another example of Defendant's infringement, on or about June 24, 2022, the

Island Company Rum Instagram page announced that rum products are available for sale at various

liquor stores and bars in Palm Beach County, including but not limited to Inlet Harbour Lounge &

Liquors at 146 Blue Heron Blvd, Riviera Beach, FL 33404; Singer Island Liquor Booth at 1241

Blue Heron Blvd, Riviera Beach, FL 33404; and Scotti's Wines and Liquors at 369 S. County Rd,

Palm Beach, FL 33480.  These products bear marks which infringe IP Acquisitions' Intellectual Property.



(Ex. 16 at page 17,

https://www.instagram.com/stories/highlights/17914809482525307/?hl=en);



(Ex. 16 at page 18,

https://www.instagram.com/stories/highlights/17914809482525307/?hl=en);



(Ex. 16 at page 19,

https://www.instagram.com/stories/highlights/17914809482525307/?hl=en).

63.     As another example of Defendants' infringement, a June 23, 2022 post on Antle's

Instagram page depicts infringing products being displayed at the Hilton Hotel at 600 Okeechobee

Blvd., West Palm Beach, FL 33401:



(Ex. 16 at page 22,

https://www.instagram.com/stories/highlights/17999071132450761/?hl=en).

64.     As another example of Defendants' infringement, a July 8, 2022, post on the Island Company Rum Instagram page advertises that Island Company Rum is available at a variety of locations in Palm Beach County and Martin County:



(Ex. 16 at page 26,

https://www.instagram.com/stories/highlights/17910977912252911/?hl=en)

65.     As another example of Defendants' infringement, a July 14, 2022 post on the Island Company Instagram page advertises that the "ISLAND COMPANY STORE NOW RE-OPENED! ... SHIPPING TO 30+ STATES".



(Ex. 16 at page 34,

https://www.instagram.com/stories/highlights/17971889494497287/?hl=en)

66.     As another example of Defendants' infringement, on or about July 15, 2022, Defendants began using the IslandCompany.com and IslandCompanyRum.com websites to market merchandise, including shirts, hats, drinkware, and bar accessories, which infringe IP Acquisitions' Intellectual Property:

28



(Ex. 16 at page 35,

https://store.islandcompanyrum.com/collections/bar-mats-island-company-rum)

67.     As another example of Defendants' infringement on or about July 19, 2022,

Defendants posted the following on the Island Company Rum Instagram page:

29



(Ex. 16 at page 27,

https://www.instagram.com/stories/highlights/17914809482525307/?hl=en)

68.    As another example of Defendants' infringement, on or about July 14, 2022,

Defendants posted the following on the Island Company Rum Instagram page:



(Ex. 16 at page __,

https://www.instagram.com/stories/highlights/17910977912252911/?hl=en)

69.     In addition to using IP Acquisitions' Intellectual Property without authorization,

Defendants have been actively seeking to register *additional* trademarks which are identical to

and/or derivatives of IP Acquisitions' Intellectual Property.

70.     For example, on October 22, 2021, Defendant ICRUM filed eight new applications

with the USPTO seeking to register trademarks for, *inter alia*, ISLAND COMPANY, ISLAND

COMPANY RUM, and QUIT YOUR JOB BUY A TICKET GET A TAN FALL IN LOVE

NEVER RETURN trademarks. A true and correct copy of each such application is attached hereto

as Composite Exhibit 18. ICRUM, in these trademark applications, failed to notify the USPTO of

the Judicial Foreclosure Sale which resulted in IP Acquisitions obtaining the rights and interests

to the ISLAND COMPANY mark and the QUIT YOUR JOB BUY A TICKET GET A TAN

FALL IN LOVE NEVER RETURN mark, and all derivatives thereof.

**COUNT I:**
**FEDERAL TRADEMARK INFRINGEMENT,**
**SECTION 32 OF THE LANHAM ACT, 15 U.S.C. § 1114**
**(ALL DEFENDANTS)**

71.     IP Acquisitions re-alleges and re-avers paragraphs 1-70 as though fully set forth

herein.

72.     IP Acquisitions owns a valid, subsisting, and incontestable United States

Trademark Registration for its ISLAND COMPANY and QUIT YOUR JOB BUY A TICKET

GET A TAN FALL IN LOVE NEVER RETURN marks, among other marks (the "IP Acquisitions

Trademarks").

73.     Defendants have used IP Acquisitions' Trademarks[3] in association with rum,

clothing, and drinkware products. IP Acquisitions' and Defendants' respective goods are identical

or commercially related.

74.     On information and belief, Defendants have applied for trademark applications

and/or continue to apply for trademark applications with the USPTO for trademarks which are

identical to, derivatives of, and/or confusingly similar to the IP Acquisitions Trademarks.

75.     Defendants' use of IP Acquisitions' Trademarks as well as trademarks which are

identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks has caused,

---

[3] As used herein, "IP Acquisitions' Trademarks" refers to all U.S. marks which are IP
Acquisitions' Intellectual Property, including but not limited to the marks listed in Exhibit 1,
attached hereto.

and is likely to cause, confusion in the minds of the consuming public, leading the public to believe that Defendants' goods emanate or originate from IP Acquisitions and/or that IP Acquisitions has approved, sponsored, or otherwise associated itself with Defendants, and vice versa, which is false.

76.     On information and belief, Defendants' adoption and use of IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks has exploited, and is intended to exploit, the goodwill and reputation associated with IP Acquisitions' Trademarks, and to take competitive advantage of IP Acquisitions without Defendants' own expenditure of resources, and thus constitutes willful infringement of IP Acquisitions' Trademarks.

77.     IP Acquisitions has no control over the quality of the goods provided by Defendants under the IP Acquisitions Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks.  Because of the likelihood of confusion as to the source of Defendants' goods, IP Acquisitions' valuable goodwill in IP Acquisitions' Trademarks is at the mercy of Defendants' unauthorized use of the marks.

78.     Defendants' acts have caused and, unless and until such acts are enjoined by this Court pursuant to 15 U.S.C. § 1116, will continue to cause, IP Acquisitions great and irreparable injury.

79.     IP Acquisitions has no adequate remedy at law for the wrongful acts of Defendants.

80.     As a result of Defendants' wrongful actions, IP Acquisitions has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

81.     Under 15 U.S.C. § 1117, IP Acquisitions is entitled to recover its actual damages and Defendants' profits attributable to their infringement of IP Acquisitions' Trademarks through Defendant's use of trademarks which are identical to, derivatives of, and/or confusingly similar to

IP Acquisitions' Trademarks.  Moreover, this case is exceptional, and IP Acquisitions is entitled to recover its reasonable attorneys' fees.

**COUNT II:**
**FEDERAL UNFAIR COMPETITION AND FALSE**
**DESIGNATION OF ORIGIN**
**SECTION 43 OF THE LANHAM ACT, 15 U.S.C. § 1125(a)**
**(ALL DEFENDANTS)**

82.     Plaintiff re-alleges and re-avers paragraphs 1-70 as though fully set forth herein.

83.     Defendants' use in commerce of IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks on or in connection with Defendants' goods constitutes a false designation of origin, and/or a false or misleading description or representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with IP Acquisitions, or as to the origin, sponsorship, or approval of Defendants' goods by IP Acquisitions and vice versa, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

84.     Defendants' adoption and use of IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks has exploited, and is intended to exploit, the goodwill and reputation associated with IP Acquisitions' Trademarks, and to take competitive advantage of IP Acquisitions without Defendants' own expenditure of resources, and thus constitutes willful infringement of IP Acquisitions' Trademarks.

85.     IP Acquisitions has no control over the quality of the goods provided by Defendants under IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks.  Because of the likelihood of confusion as to the source of Defendants' goods, IP Acquisitions' valuable goodwill in IP Acquisitions' Trademarks is at the mercy of Defendants' unauthorized use of IP Acquisitions' Trademarks as

well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks.

86.     Defendants' acts have caused, and unless and until such acts are enjoined by this Court pursuant to 15 U.S.C. § 1116, will continue to cause, IP Acquisitions great and irreparable injury.

87.     IP Acquisitions has no adequate remedy at law for the wrongful acts of Defendants.

88.     As a result of Defendants' wrongful actions, IP Acquisitions has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

89.     Under 15 U.S.C.§ 1117, IP Acquisitions is entitled to recover their actual damages and Defendants' profits attributable to their infringement of IP Acquisitions' Trademarks. Moreover, this case is exceptional, and IP Acquisitions is entitled to recover its reasonable attorneys' fees.

**COUNT III:**
**COMMON LAW TRADEMARK INFRINGEMENT**
**(ALL DEFENDANTS)**

90.     Plaintiff re-alleges and re-avers paragraphs 1-70 as though fully set forth herein.

91.     IP Acquisitions owns valid trademarks entitled to protection under common law.

92.     Defendants have infringed IP Acquisitions' rights in the IP Acquisitions' Trademarks by using in commerce IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks in connection with the promotion, advertising, distribution, offering for sale and sale of rum, clothing, and drinkware.

93.     Defendants' use of IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks has caused and/or is likely to cause confusion, to cause mistake, and/or to deceive the relevant consuming

35

public as to the affiliation, connection, or association of Defendants with IP Acquisitions, or as to the origin, sponsorship, or approval of Defendants' goods by IP Acquisitions, and vice versa, all to the damage and detriment of IP Acquisitions' reputation and goodwill.

94.     Defendants' actions have been willful, deliberate, and intended to benefit Defendants at IP Acquisitions' expense.

95.     Defendants' actions constitute trademark infringement under Florida common law.

96.     Defendants' actions have caused, and will continue to cause, irreparable harm to IP Acquisitions, and will continue to so harm IP Acquisitions unless permanently enjoined.

97.     IP Acquisitions has no adequate remedy at law for the wrongful acts of Defendants.

98.     As a result of Defendants' wrongful actions, IP Acquisitions has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**COUNT IV:**
**VIOLATION OF ANTI-CYBERSQUATTING CONSUMER**
**PROTECTION ACT,**
**15 U.S.C. § 1125(d)(1)(A)**
**(ALL DEFENDANTS)**

99.     Plaintiff re-alleges and re-avers paragraphs 1-70 as though fully set forth herein.

100.    As alleged above, IP Acquisitions owns rights to its trademarks ISLANDCOMPANY as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks including but not limited to ISLANDCOMPANYRUM, and owns rights to corresponding domain names, including but not limited to www.islandcompany.com and www.islandcompanyrum.com, and including but not limited to the domain names listed in Exhibit 1, attached hereto.

101.    As alleged above, Defendants with bad faith intent to profit from IP Acquisitions ownership of IP Acquisitions' Intellectual Property, including IP Acquisitions' Trademarks and

domain names, have refused IP Acquisitions' demands to relinquish control of the domain names.

102.     The acts of Defendants constitute a violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

103.     Plaintiff has been and will continue to be damaged by the acts of Defendants complained of herein.

**COUNT V:**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT (FDUTPA)**
**(ALL DEFENDANTS)**

104.     Plaintiff re-alleges and re-avers paragraphs 1-70 as though fully set forth herein.

105.      The above-described conduct of Defendants constitutes deceptive trade practices in violation of Sections 501.201-501.213, Florida Statutes, insofar as Defendants:

A. Pass off goods or services as those of another;

B. Cause likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

C. Cause likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with or certification by another;

D. Represent that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; and/or

E. Engaged in the unfair, unethical, unscrupulous, and deceptive concealment, alienation, and transfer of the Collateral in an improper effort to avoid the reach of Defendants' creditors.

106.      Defendants have engaged in the above-described conduct willfully and deliberately and with full knowledge of IP Acquisitions' rights.

107.      Defendants' aforesaid conduct has caused and, unless and until such conduct is restrained and enjoined by this Court, will continue to cause great immediate and irreparable injury to IP Acquisitions, including but not limited to irreparable injury to IP Acquisitions' reputation and goodwill.

108.      As the direct and proximate result of Defendants' wrongful conduct, IP Acquisitions has suffered and will continue to suffer actual injury and the loss of money in an amount to be proven at trial.

109.      Defendants' wrongful acts have injured and will continue to injure IP Acquisitions by imparting a loss of customers, a loss of goodwill, confusion and/or a likelihood of confusion among existing and potential customers, injury to IP Acquisitions reputation, and/or diminution in the value of IP Acquisitions' Trademarks.

110.      Defendants have realized revenue and profits by virtue of their wrongful conduct that they otherwise would not have obtained and to which they are not entitled.

111.      IP Acquisitions has no adequate remedy at law for the wrongful actions of Defendants.

## COUNT VI:
## CONVERSION (ALL DEFENDANTS)

112.      Plaintiff re-alleges and re-avers paragraphs 1-70 as though fully set forth herein.

113.      Defendants have wrongfully asserted dominion of IP Acquisitions' property inconsistent with IP Acquisitions' ownership of the property.

114.     Defendants have improperly deprived IP Acquisitions of possession of IP Acquisitions' websites, web domains, and social media accounts, including but not limited to the websites, web domains, and social media accounts listed in Exhibit 1, attached hereto.

115.     Defendants' retention and/or use of these items is wrongful, unjust, and against the rights of IP Acquisitions.

116.     Defendants' wrongful actions have unlawfully benefited their business and caused damage to IP Acquisitions.  The continued retention of these websites, web domains, and social media accounts, including passwords and account information, will result in future damage to IP Acquisitions if such information is not returned.

117.     IP Acquisitions is entitled to immediate possession of the websites, web domains, and social media accounts, as well as any and all profits that Defendants have acquired by the unlawful conversion.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff IP Acquisitions respectfully prays for the following relief:

A.  That judgment be entered for IP Acquisitions on all of its respective claims;

B.  A finding that Defendants' acts constitute a violation of the claims alleged in Counts I through VI;

C.  That Defendants and their agents, servants, employees, attorneys, successors, and assigns, and any and all persons acting in concert or participating with them, or any of their successors or assigns, be both preliminarily and permanently enjoined from:

a.  using IP Acquisitions' Trademarks or any other mark that is a colorable imitation of, or is confusing similar to those marks or any other mark or designation of IP Acquisitions in association with the advertising, distribution, marketing, offering for sale, and/or sale of Defendants' goods;

b.  imitating, copying, duplicating, circulating, selling, or otherwise disposing of Defendants' goods or related advertising or promotional materials which bear any copy or colorable imitation of IP Acquisitions' Trademarks;

c.  manufacturing, producing, distributing, circulating, selling, or otherwise disposing of Defendants' goods or related advertising or promotional materials which bear any copy or colorable imitation of IP Acquisitions' Trademarks;

d.  doing any other act or thing likely to confuse, mislead, or deceive others into believing that Defendants' goods are affiliated with, connected to, sponsored by, or approved or permitted by IP Acquisitions or IP Acquisitions' goods;

e.  using false representations or descriptions in commerce or using false designations of origin that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants' goods with IP Acquisitions or as to the origin, sponsorship, or approval of Defendants' goods;

f.  otherwise infringing IP Acquisitions' common law rights in IP Acquisitions' Trademarks in association with the advertising, distribution, marketing, offering for sale, and/or sale of Defendants' goods;

g.   unfairly competing with IP Acquisitions or otherwise injuring their business reputation in any manner relating to Defendants' goods;

h.   registering or applying to register for IP Acquisitions' Trademarks and/or as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks, service marks, domain names, social media accounts, or other source identifier or symbol of origin consisting of or incorporating IP Acquisitions' Trademarks or any other mark that infringes or is likely to be confused with IP Acquisitions' Trademarks;

i.   continuing to own, use, or operate any website or social media account associated with IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks; and

j.   assisting, aiding, or abetting another person or business entity in engaging in or performing any of the above activities.

D.   That Defendants, and any and all persons controlled by or acting in concert with Defendants, be required to deliver to IP Acquisitions for destruction all materials that bear or depict IP Acquisitions' Trademarks as well as trademarks which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions' Trademarks, or that are otherwise in violation of this Court's order issued pursuant hereto;

E.   That Defendants, and any and all persons controlled by or acting in concert with Defendants, be required to deliver to IP Acquisitions for destruction their entire inventory of products bearing IP Acquisitions' Trademarks as well as trademarks

which are identical to, derivatives of, and/or confusingly similar to IP Acquisitions'
Trademarks;

F.   That Defendants, and any and all persons controlled by or acting in concert with
Defendants, be required to deliver to IP Acquisitions all website, web domain, and
social media account information and documentation, including but not limited to
usernames and passwords for each such account;

G.   That an accounting be directed to determine any and all of Defendants' profits
resulting from Defendants' unlawful acts alleged herein, and that any such profits be
paid over to IP Acquisitions and increased as the Court finds to be just under the
circumstances of this case;

H.   That IP Acquisitions be awarded their actual damages;

I.   That IP Acquisitions be awarded statutory damages for Defendants' willful
counterfeiting of IP Acquisitions' Trademarks;

J.   That Defendants' conduct be found to have been willful, that this case be deemed
exceptional within the meaning of 15 U.S.C. § 1117, and that IP Acquisitions be
reimbursed their full costs and reasonable attorneys' fees incurred in this action;

K.   For prejudgment interest on any monetary award; and

L.   That IP Acquisitions be awarded such other and further relief as this Court may deem
just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully Submitted,

Date:  August 22, 2022      By:    /s/ Elissa A. Tisdahl, Esq.
Elissa A. Tisdahl, Esq.
etisdahl@cwiplaw.com
Florida Bar No. 85521
John Christopher, Esq.
jchristopher@cwiplaw.com
Florida Bar No. 493465
Andrew Goldberg, Esq.
agoldberg@cwiplaw.com
Florida Bar No. 1030784
CHRISTOPHER & WEISBERG, P.A.
1232 N. University Drive
Plantation, FL 33322
(954) 828-1488 (Telephone)
(954) 828-9122 (Facsimile)
*Counsel for Plaintiff*
Island IP Acquisitions, LLC